# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal Action No. 04-128 (RMC)** |
| ) | |
| **JONATHAN FRANKLIN,** *et al.*, ) | |
| ) | |
| **(KENNETH DODD,** ) | |
| **SHAWN HINSON,** ) | |
| **JONTE D. ROBINSON,** ) | |
| **TOMMIE DORSEY,** ) | |
| **LARRY GOOCH,** ) | |
| **and KEITH A. ODLE)** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER
## ON MOTIONS TO JOIN, SEVER, AND DISMISS

Defendants Kenneth Dodd, Jonte Robinson, Tommie Dorsey, and Larry Gooch are

scheduled to be tried together in early January 2007 on narcotics conspiracy, RICO conspiracy,[1] and

various drug and violence charges associated with their alleged membership in the "M Street Crew."[2]

The Government has moved to add Defendants Shawn Hinson and Keith Odle to the January 2007

trial. Messrs. S. Hinson and Odle oppose joinder and Messrs. Dodd, J. Robinson, and Dorsey move

---

[1] Racketeering Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 *et seq.*
(2005).

[2] Certain other defendants named in the same second superseding indictment (hereinafter,
the "indictment") — namely, Jonathan Franklin, Joseph Blackson, William D. Robinson, William
H. Simmons, and George Wilson (collectively, "Group One") — were tried and convicted in the
Spring of 2006. A second group of defendants from the same indictment was originally scheduled
for trial in September 2006 but all pled to a "wired" plea (collectively, "Group Two"). A separate
group of defendants in a related case, *United States v. Bascom*, No. 04-127, was scheduled for trial
in the Summer of 2005 but entered pleas just before trial.

to sever their trials from that of Mr. Gooch, who alone faces the death penalty.  Messrs. Odle and

Gooch, joined by several of their codefendants, move separately to sever and/or dismiss various

counts.  The motions for joinder, severance, and dismissal are fully briefed and were argued to the

Court at a hearing on July 31, 2006.  At a later hearing on October 25, 2006, the Court announced

that the motions for joinder would be granted and the motions to sever defendants denied; this

Memorandum Opinion explains the reasoning behind those conclusions.  In addition, the Court will

deny the motions to dismiss and/or sever counts.  Messrs. Odle and S. Hinson will therefore join

Messrs. Dodd, J. Robinson, Dorsey, and Gooch in the Group Three trial set to begin in January 2007,

on each of the charges set forth in the indictment.

## I. LEGAL STANDARDS

Joinder of defendants and offenses in multi-defendant cases is governed by Federal

Rule of Criminal Procedure 8(b), which provides in part: "The indictment or information may charge

2 or more defendants if they are alleged to have participated in the same act or transaction, or in the

same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b);[3]

*United States v. Wilson*, 26 F.3d 142, 153 n.4 (D.C. Cir. 1994) ("In cases involving multiple

defendants, the weight of authority in this circuit and elsewhere regards Rule 8(b) as providing the

sole standard for determining the permissibility of joinder of offenses." (internal quotation marks

omitted)); *see also United States v. Jackson*, 562 F.2d 789, 794 (D.C. Cir. 1977) ("It is firmly

established in the case law that the propriety of joinder in cases where there are multiple defendants

---

[3] It continues: "The defendants may be charged in one or more counts together or separately.
All defendants need not be charged in each count."  Fed. R. Crim. P. 8(b).

must be tested by Rule 8(b) alone and that Rule 8(a) has no application." (quoting 1 C. Wright, Federal Practice and Procedure § 144, at 318-19 (1969)).

While it is "difficult to prevail on a claim that there has been misjoinder under Rule 8(b), there are definite limits to what the government can put together in a single indictment." *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991). Rule 8(b) "may not be read to embrace similar or even identical offenses, *unless* those offenses are related. . . . There must be a logical relationship between the acts or transactions within the series." *Id.* (citing *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)). "Rule 8(b) can be satisfied either by the indictment alone, as 'for instance when a conspiracy charge links all the offenses and defendants,' or by 'subsequent pre-trial representations.'" *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (quoting *Perry*, 731 F.2d at 990); *see also United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000) (holding that joinder is proper, even in cases *without* a conspiracy count, when prosecutors "present evidence that [defendants'] offenses arose out of their participation in the same drug distribution scheme." (internal quotation marks omitted; alteration in original)). Moreover, "[j]oint trials are favored in RICO cases," *United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999), and "an offense that is chargeable as a RICO predicate may be joined to an offense that is not chargeable as a RICO predicate so long as the two offenses satisfy this test of 'logical relationship.'" *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987) (quoting *Perry*, 731 F.2d at 990).

Even when joinder of defendants and offenses is proper under Rule 8(b), Federal Rule of Criminal Procedure 14(a) permits a court to sever defendants or counts, or "provide any other relief that justice requires," if the joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). The Supreme Court has instructed that "when defendants properly have been

joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  The Court suggested that such risk is "heightened" when, for example, "many defendants are tried together in a complex case and they have markedly different degrees of culpability" or evidence "that would not be admissible if a defendant were tried alone is admitted against a codefendant."  *Id.*[4]

Accordingly, the D.C. Circuit has instructed that "[s]everance may be required . . . when the evidence against one defendant is far more damaging than the evidence against the other defendant[s]."  *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991) (internal quotation marks omitted); *see also Richardson*, 167 F.3d at 624.  "The few cases in which [the D.C. Circuit has] overturned a trial court's denial of a motion to sever have involved clear disparities between the weight, quantity, or type of the evidence against the movant and against the other defendants."  *Halliman*, 923 F.2d at 884.  The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant."  *Id.*  In any event, measures less drastic than severance, such as limiting instructions, often suffice to cure any risk of prejudice.  *Zafiro*, 506 U.S. at 539.  In addition, the trial court "has a continuing duty at all stages of the trial to grant a severance if prejudice does appear."  *Schaffer v. United States*, 362 U.S. 511, 516 (1960); *Perry*, 731 F.2d at 992.

---

[4] The Court also suggested that such risk might be present when there is "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" and when "a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial."  *Zafiro*, 506 U.S. at 539.

## II. DISCUSSION

### A. Motions to Sever Based on the Death Penalty

Messrs. Dodd, J. Robinson, and Dorsey argue that they should be severed from trial with Mr. Gooch for three reasons: (1) the joinder of noncapital defendants with capital defendants is so inherently prejudicial as to warrant severance because death-qualified juries are biased toward the prosecution and are thus demonstrably more conviction prone; (2) a joint trial will prejudice them because of the significant evidence of violence that will be presented against Mr. Gooch; and (3) there is a risk of antagonistic defenses because Mr. Gooch may be singularly focused on avoiding the death penalty and may even concede guilt as to some common charges.

As the Court has explained, in addition to the narcotics and RICO conspiracies charged in Counts 1 and 2,

> Messrs. Gooch, Dorsey, and J. Robinson are charged with violent substantive offenses including first-degree murder, burglary, and armed robbery in connection with the deaths of William Cunningham and Christopher Lane in August 2000. Mr. Gooch is also charged with the first-degree murder of Miguel Miles in September 2002; assault with intent to kill a police officer in November 2002; and the first-degree murders of Yolanda Miller and Calvin Cooper in February 2003. And Mr. K. Dodd, though not charged with such crimes of violence, is charged with more than a dozen counts of narcotics possession and distribution during and throughout 2003, sometimes accompanied by Messrs. J. Robinson, Gooch, or Franklin. He also faces charges of possession of several firearms, guns, ammunition, drugs, and drug paraphernalia, which were seized when he was arrested at his apartment.

Order of Dec. 16, 2005, at 30-31 [Dkt. #448]. Mr. J. Robinson, joined by Mr. Dorsey, previously argued that more than a dozen firearms and violence charges related to the Cunningham/Lane murders should be severed as factually unrelated to the narcotics and RICO conspiracies. *Id.* at 32.

The Court denied the motion, finding that the offenses were properly joined under Rule 8(b) and that it was "premature to determine, without the benefit of an evidentiary record, whether the Government ha[d] met its burden to demonstrate that the crimes . . . were in furtherance of the conspiracies." *Id.* at 32-33.

With that background in mind, the Court turns to Defendants' present arguments that the Court should exercise its discretion to grant a severance under Rule 14.

### 1. Death-qualified jury

The objections of Messrs. Dodd, J. Robinson, and Dorsey to being tried by a death-qualified jury rest mainly on what they characterize as the "generally prejudicial nature" of a capital trial. *See, e.g.*, Dodd Mot. at 3 [Dkt. #367]. As Mr. Dorsey explains,

> The crux of the problem with death qualification is that it produces juries who (1) are significantly more prone to convict than ordinary juries; and (2) have attitudes toward such issues as the presumption of innocence, the insanity defense, the right of a criminal defendant not to testify and other constitutional and procedural protections afforded defendants which are significantly prosecution-oriented.

Dorsey Mot. at 8-9 [Dkt. #358]. Or, as Mr. Dodd puts it, severance is warranted "absent a showing of any specific prejudice because procedures used to obtain a death[-]qualified jury produce[] juries uncommonly willing to sentence people to die." Dodd Mot. at 2. This problem is compounded, Defendants insist, by the fact that, in 1992, D.C. voters rejected the establishment of the death penalty in the District by a 2-1 margin, meaning that "the potential number of excludable jurors . . . could well be so high that only a relatively small fraction of the community is eligible to serve." J. Robinson Mot. at 3 [Dkt. #361].

However, as the Government argues, it is firmly settled that the death qualification of a jury does not violate the Sixth and Fourteenth Amendment rights of a non-capital defendant, when joined for trial with a capital defendant, to an impartial jury drawn from a fair cross section of the community.  Indeed, nearly twenty years ago in *Buchanan v. Kentucky*, 483 U.S. 402 (1987), the Supreme Court confronted this precise issue.  There, the Court considered "the question whether petitioner was deprived of his right to an impartial jury, representative of a fair cross section of the community, because the Commonwealth of Kentucky was permitted to 'death-qualify' the jury in his joint trial where the death penalty was sought against his codefendant." *Id.* at 404.  Relying on its reasoning in *Lockhart v. McCree*, 476 U.S. 162 (1986), the Court first rejected the petitioner's claim that death qualification violates the fair cross section requirement, because that requirement applies to venires, not petit juries, and, in any event, those excluded on the basis of their fervent opposition to the death penalty do not constitute a "distinctive group" for fair cross section purposes. *Id.* at 415.  The Court next rejected the petitioner's claim that he was denied his right to an impartial jury, finding that argument at odds with the understanding that impartiality requires not that jurors' viewpoints and predilections be balanced, but simply that jurors will conscientiously find the facts and apply the law.  *Id.* at 417.[5]

This case is arguably distinguishable only in that Defendants have moved for severance, while in *Buchanan* the petitioner did not.  *Id.* at 407.  However, the Court in *Buchanan* recognized that the petitioner had fairly raised the issue by twice requesting that his guilt-phase jury

---

[5] The Supreme Court assumed in *Buchanan*, as it had in *McCree*, that the sociological studies before it were "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries *somewhat* more 'conviction-prone' that 'non-death-qualified' juries." *Buchanan*, 483 U.S. at 415 n.16.  This Court makes the same assumption.

not be death-qualified. *Id.* at 408. "In essence," the Court stated, "[the petitioner] argued that the 'death qualification' of the jury . . . violated his right to an impartial jury drawn from a fair cross section of the community in violation of the Sixth and Fourteenth Amendments." *Id.* Thus, the *Buchanan* Court's answer to that question is controlling here. Other courts have reached the same conclusion. *Furman v. Wood*, 190 F.3d 1002, 1005 (9th Cir. 1999) ("*Buchanan* . . . holds that death qualification does not violate the rights of a non-capital defendant tried jointly with a capital defendant."); *United States v. Gray*, 173 F. Supp. 2d 1, 17 (D.D.C. 2001) ("[I]f a death-qualified jury is able to try the guilt-innocence phase of a capital defendant, it would be illogical to conclude that empaneling the same jury would result in unconstitutional prejudice to non-capital defendants.") (citing *United States v. Edelin*, 118 F. Supp. 2d 36, 48 (D.D.C. 2000)).

   Conceding that the weight of authority does not mandate severance on this ground, Mr. J. Robinson urges the Court to consider it as "a factor . . . in the severance equation." J. Robinson Mot. at 2 [Dkt. #361]. Defendants give short shrift, however, to the Government's significant interests in a joint trial when the charged offenses arise out of their participation in the same scheme, *Gbemisola*, 225 F.3d at 760, particularly where the Government faces "the burden of presenting the same evidence to different juries where . . . [several] defendants, only one of whom is eligible for a death sentence, are charged with crimes arising out of the same series of events," *Buchanan*, 483 U.S. at 418-19. To the extent that discretion to sever remains, it is tempered by the Supreme Court's admonition that "when defendants properly have been joined . . . a district court should grant severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. 539. Here, trial before a death-qualified jury does not,

in and of itself, violate Defendants' right to an impartial jury drawn from a fair cross section of the community, and Defendants identify no other "specific trial right" that might be compromised.

### 2. Disparity of evidence of violence

Severance would nevertheless be proper if the jury would be prevented from making a "reliable judgment about guilt or innocence" because of marked disparities in the culpability of the defendants or the weight, quantity, or type of evidence adduced against them. *See Zafiro*, 506 U.S. at 539; *Halliman*, 923 F.2d at 884. In this vein, Mr. Dodd argues that he would be prejudiced by having to stand trial with Mr. Gooch, asserting that evidence of Mr. Gooch's alleged crimes would not be admissible in a trial involving only Mr. Dodd. Dodd Mot. at 1. Mr. J. Robinson[6] argues that, although he is charged with certain crimes of violence and weapons use, Mr. Gooch faces a "far more substantial array of such charges," J. Robinson Mot. at 2 [Dkt. #388]. He fears that joinder with Mr. Gooch risks spillover; that is, that evidence of homicides in which Mr. Gooch alone was involved will taint the verdict as to him. *Id.* at 3; J. Robinson Mot. at 4-5 [Dkt. #361]. He concedes, however, that such testimony "may be relevant even in a separate trial." J. Robinson Mot. at 4 [Dkt. #388]. Mr. Dorsey likewise points to a disparity in the alleged roles of, and the quantum of evidence against, the noncapital defendants and Mr. Gooch. Dorsey Mot. at 4.

It is helpful to review these arguments against the background of the charges leveled against each of the defendants. Multiple counts charge Messrs. Gooch, Dorsey, and J. Robinson with acts of violence, while some charges of violence are limited to Mr. Gooch:

---

[6] Mr. J. Robinson filed an earlier motion to dismiss [Dkt. #289], arguing that there was improper joinder of the allegations involving his participation in the Cunningham/Lane murders with the RICO enterprise. The Court denied that motion but did not address his motions to sever based upon the determination that the Government will seek the death penalty against Mr. Gooch. Order of Dec. 16, 2005, at 18 n. 11.

- Count 110: Gooch, Dorsey, J. Robinson: first degree burglary while armed;[7]

- Count 111: Gooch, Dorsey, J. Robinson: armed robbery;

- Count 112: Gooch, Dorsey, J. Robinson: first degree murder of William Cunningham (during the armed burglary referenced in Count 110);

- Count 113: Gooch, Dorsey, J. Robinson: first degree murder of Christopher Lane (during the armed burglary referenced in Count 110);

- Count 114: Gooch, Dorsey, J. Robinson: first degree murder of William Cunningham (during the armed robbery referenced in Count 111);

- Count 115: Gooch, Dorsey, J. Robinson: first degree murder of Christopher Lane (during the armed robbery referenced in Count 111);

- Count 116: Gooch, Dorsey, J. Robinson: first degree, premeditated murder of William Cunningham;

- Count 117: Gooch, Dorsey, J. Robinson: first degree, premeditated murder of Christopher Lane;

- Count 118: Gooch, Dorsey, J. Robinson: Violent Crime in Aid of Racketeering Activity ("VICAR") murder of William Cunningham;

- Count 119: Gooch, Dorsey, J. Robinson: VICAR murder of Christopher Lane;

- Count 120: Gooch: first degree, premeditated murder of Miguel Miles;

- Count 121: Gooch: VICAR murder of Miguel Miles

- Count 122: Gooch: assault (with intent to kill) of a police officer while armed;

- Count 123: Gooch: assault of a police officer with a deadly weapon while officer was engaged in, and on account of, the performance of official duties;

- Count 124: Gooch: VICAR attempted murder of a police officer;

---

[7] The Court notes that these counts are allegations that remain to be proved, or not, before a jury.

- Count 125: Gooch: first degree, premeditated murder of Yolanda Miller;

- Count 126: Gooch: VICAR murder of Yolanda Miller;

- Count 127: Gooch: first degree, premeditated murder of Calvin Cooper;

- Count 128: Gooch: VICAR murder of Calvin Cooper;

- Counts 142-143: Gooch, Dorsey, J. Robinson: using or carrying a firearm in relation to a crime of violence or drug trafficking;

- Counts 144-147: Gooch: using or carrying a firearm in relation to a crime of violence or drug trafficking;

- Counts 150-153: Gooch, Dorsey, J. Robinson: possession of a firearm during a crime of violence or dangerous offense;

- Counts 154-157: Gooch, Dorsey, J. Robinson: possession of a firearm during a crime of violence or dangerous offense.

In addition, Mr. Dodd is charged separately in two counts:

- Count 140: Dodd: using, carrying or possessing a firearm during a drug trafficking offense;

- Count 141: Dodd: felon in possession of a firearm.

As the above recitation shows, Messrs. Gooch, Dorsey, and J. Robinson are charged together in twenty counts of violence or gun possession, while Mr. Gooch is charged alone in thirteen. It bears note that, although the Attorney General ultimately authorized the U.S. Attorney to seek the death penalty against Mr. Gooch alone, the gravity of the charges against Messrs. Dorsey and J. Robinson made them candidates for the death penalty as well. *See* Notice of Sept. 19, 2005 [Dkt. #325]. Moreover, because all Group Three defendants are charged in Count 1 (narcotics conspiracy) and Count 2 (RICO conspiracy), each is chargeable with all acts committed in furtherance of those conspiracies — including the crimes of violence allegedly perpetrated by Mr.

-11-

Gooch alone.  *See* Order of Dec. 16, 2005, at 25 (citing *Sampol*, 636 F.2d at 645).  Were they to be

tried alone, such evidence would be admissible against them to demonstrate the scope of the

conspiracy.  The Court thus finds that, based on the nature of the charges and evidence now before

it, the roles of Messrs. J. Robinson and Dorsey in the conspiracy are substantially similar to that of

Mr. Gooch, and that the weight, type, and quantity of evidence against them does not warrant

severance from him.

      Mr. Dodd's situation is not meaningfully different.  Although he is not charged

substantively in connection with the murders, he faces "more than a dozen counts of narcotics

possession and distribution during and throughout 2003" and "charges of possession of several

firearms, guns, ammunition, drugs, and drug paraphernalia."  *Id.* at 30-31.  Although there is

certainly *some* disparity here, the critical question is whether this disparity is so dramatic that a jury

would be unable to reasonably compartmentalize the evidence against Mr. Dodd.  *Halliman*, 923

F.2d at 884.  It is not.  As the Court noted before the Group One trial,

> the principal evidence proffered by the Government — extensive
> wiretap recordings — greatly reduces the risk of prejudice against the
> defendants charged with less serious substantive offenses.  The D.C.
> Circuit has recognized that the risk of "spillover prejudice" is
> minimized when the Government presents "evidence of each
> transaction, consisting largely of tape recordings of the participants'
> own words, separately and in chronological order."  *Spriggs*, 102 F.3d
> at 1257; *see also United States v. Anderson*, 39 F.3d 331, 348 (D.C.
> Cir. 1994).

Order of Dec. 16, 2005, at 27.  The same observations hold true for Mr. Dodd, who primarily faces

drug trafficking charges that will be supported in large part by wiretap evidence.  The orderly

presentation of evidence and careful instruction of the jury will neutralize any risk of spillover

presented by the small disparity here, and severance is not required.

-12-

### 3. Risk of antagonistic defenses

Finally, Messrs. J. Robinson and Dorsey argue that there is a risk of antagonistic defenses because Mr. Gooch may be singularly focused on avoiding the death penalty and may even concede guilt as to some common charges.  Specifically, Mr. J. Robinson suggests that the expected emphasis on the death penalty during *voir dire* may leave the jury with the mistaken impression that its principal job will be to decide questions of life or death, rather than guilt or innocence.  J. Robinson Mot. at 4.  Likewise, Mr. Dorsey suggests that Mr. Gooch's focus at trial may be on avoiding death rather than contesting guilt, which would create strategic conflicts in terms of jury selection and defense theories.

"Mutually antagonistic defenses exist where the acceptance of one defendant's defense is irreconcilable with the defense presented by a codefendant." *United States v. Gilliam*, 167 F.3d 628, 635 (D.C. Cir. 1999).  To demonstrate the need for severance on this ground, however, a defendant "must show more than the presence of some hostility among codefendants, and more than the fact that codefendants whose strategies [a]re generally antagonistic were tried together." *Id.* (quoting *Brown*, 16 F.3d at 433) (internal quotation marks omitted).  Indeed, "[e]ven where codefendants implicate each other, their defenses are not necessarily mutually antagonistic." *Id.*[8] At this stage, neither Mr. J. Robinson nor Mr. Dorsey has yet to hint at his defense theory, and neither offers more than speculation as to what Mr. Gooch's defense might be; thus, the Court cannot conclude that there is any conflict, let alone an irreconcilable one.  Hypothetical strategic conflicts with regard to jury selection are insufficient, and careful jury instructions can guard against any

---

[8] Furthermore, mutually antagonistic defenses are not necessarily prejudicial, and even where they are, Rule 14 does not necessarily require severance; instead, "it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39.

danger that the jury will mistake its role as that of deciding questions of punishment but not guilt. In any event, the Court remains mindful of its "continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer*, 362 U.S. at 516.

For these reasons, the motions of Messrs. Dodd, J. Robinson, and Dorsey to sever their trials from that of Mr. Gooch on the basis of the death penalty are denied.

## B. Joinder of Messrs. S. Hinson and Odle

The Government has moved for joinder of Messrs. S. Hinson and Odle to the January 2007 trial. Mr. S. Hinson filed an opposition [Dkt. #517] and a supplemental motion in opposition to joinder [Dkt. #584]. Mr. Odle filed an opposition [Dkt. #516] and a separate motion for severance [Dkt. #569] raising many of the same arguments. The Government filed a reply addressing both defendants' arguments [Dkt. #574], to which only Mr. Odle replied [Dkt. #582]. Because each defendant is slightly differently situated, the Court will address each separately.

### 1. Mr. S. Hinson

Mr. S. Hinson contends that joinder would be improper under Rule 8 because there is no "identity of facts or persons" between him and his alleged coconspirators. He emphasizes that, aside from a single distribution charge (with Anthony Davis on June 24, 2003), the indictment does not connect him in any way to his codefendants. He also notes that he is not charged with any act of violence or gun possession. Mr. S. Hinson further argues that, even if joinder is proper,[9] severance under Rule 14 is appropriate due to the danger of prejudice from: a trial with a death penalty candidate; the disparity in evidence between him and his codefendants, especially the

---

[9] At oral argument on July 31, 2006, Mr. S. Hinson, through counsel, conceded that joinder was proper under Rule 8, and urged the Court to exercise its discretion to sever under Rule 14.

"gruesome" evidence of violence; and the risk that jurors will be unable to separate their emotions from the facts, resulting in spillover. In his supplemental motion, Mr. S. Hinson adds that his counsel has attempted to review the trial evidence in the Group One trial, and has found little to justify joining Mr. S. Hinson to the defendants in Group Three.[10]

The indictment charges Mr. S. Hinson in seven counts: Count 1 (narcotics conspiracy), Count 2 (RICO conspiracy), Count 34 (distribution PCP 5/14/03), Count 39 (distribution PCP 6/24/03) (with Anthony Davis), Count 40 (distribution PCP 6/26/03), Count 46 (distribution PCP 8/20/03), and Count 47 (possession with intent to distribute ("PWID") PCP 8/20/03). It also names Mr. S. Hinson in two overt acts that are not substantively charged: Overt Act 7 (distribution PCP 3/19/02) and Overt Act 8 (possession PCP 3/19/02). To connect Mr. S. Hinson to his alleged coconspirators, the Government indicates that it will present testimony from cooperators that will "identify Hinson as a member of the crew who regularly sold PCP and other drugs on the strip at M St." and will produce a "crew photo" in which Mr. S. Hinson is "himself flashing the M St. sign, alongside Larry Gooch, Jonte Robinson, and others in the crew." Gov't Reply at 6. It also expects to introduce pole camera evidence depicting Mr. S. Hinson "sitting in front of his mother's house at 1710 M St. counting money." *Id.* at 5.

The substantive charges arise from four alleged drug sales — on May 14, June 24, June 26, and August 20, 2003 — and the additional overt acts stem from a fifth sale on March 19, 2002. In a separate motion, Mr. S. Hinson challenged the use of identification procedures used during these incidents, and subsequent briefing clarified the nature of the Government's proof of

---

[10]   The Court notes that it denied a similar severance motion filed by Mr. S. Hinson [Dkt. #295] in which he made the same arguments about being joined for trial with Group One. Order of Dec. 16, 2005, at 11, 21-28.

those charges.  In essence, an undercover officer ("UC") used a "photo book" containing photos of

suspected M Street Crew members to confirm Mr. S. Hinson's identity after hand-to-hand drug sales

on May 14, June 24, and June 26, 2003;[11] and a UC confirmed his identity in "show ups" following

drug sales on March 19, 2002, and August 20, 2003.[12]  The UCs are expected to testify at trial.

In view of the Government's factual proffers, the Court concludes that there is

sufficient, particularized evidence of each of the substantive drug charges, as well the additional

overt acts, to minimize any risk of spillover.  *See United States v. Sampol*, 636 F.2d 621, 646 (D.C.

Cir. 1980) ("Not only the weight of the evidence, but also the quantity and type of evidence [to be]

adduced against codefendants, is a vital consideration in evaluating the necessity for a severance.").

And as the Court's experience with the Group One trial suggests, the orderly presentation of

evidence and careful jury instructions will help ensure that jurors are able to compartmentalize

_____

[11] According to the Government, the photo book procedures used on May 14, June 24, and June 26, 2003, were virtually identical.  For example, on May 14, UC Jermone McClinton and a confidential source drove into the 18th and M Street area and encountered Mr. S. Hinson.  After Mr. S. Hinson sold PCP to the confidential source, the UC and confidential source returned to a staging area where case agents were waiting.  The UC shared S. Hinson's name with the case agents, and selected his picture from a "photo book" containing photos of "some thirty people" known to be members of the M Street Crew or who otherwise frequented the area, thus confirming Mr. S. Hinson as the seller.  D430 at 2.  The procedures used on June 24 did not differ, except that Mr. S. Hinson provided the PCP to Anthony Davis, who consummated the exchange.  The procedures used on June 26 differed only in that the UC was alone, not accompanied by the confidential source.

[12] The show up procedures used on March 19, 2002, and August 20, 2003, were also virtually identical.  For example, in a buy/bust operation on March 19, 2002, UC Randall Parker asked Mr. S. Hinson for two dippers but only had enough money for one.  Mr. S. Hinson prepared two dippers, but when he learned the UC was short on funds, only sold him one.  The UC paid with a prerecorded $20 bill, left the area, and immediately broadcast a description of Mr. S. Hinson to a waiting arrest team.  Within "minutes" the arrest team apprehended Mr. S. Hinson, at which point, in what is known as a "show up," the UC returned to the area and confirmed that Mr. S. Hinson was the seller.  The procedures used on August 20, 2003, did not differ materially, though a different UC participated.

evidence against the various defendants. Any remaining risk of prejudice is therefore limited to the conspiracy counts, the central question being whether there will be so much evidence of violent crimes that jurors will be unable to consider separately whether Mr. S. Hinson was a member of the conspiracies. *Halliman*, 923 F.2d at 884.

While Mr. S. Hinson suggests that there is a large disparity of evidence between him and his codefendants, his central complaint is that Messrs. Gooch, Dorsey, and J. Robinson are charged with crimes of violence, including murder — and that Mr. Gooch is facing the death penalty — while he is something of a lesser player in the conspiracy. In a certain sense, his concerns relate more to a disparity of charges than to a disparity of evidence. However, as explained above in the context of Mr. Dodd's severance motion, because Mr. S. Hinson is charged in the narcotics and RICO conspiracies, he is chargeable with all acts, including the violent ones, committed in furtherance of those conspiracies, and evidence of those acts is admissible against him. The use of violence, often with guns, is alleged to be one of the methods by which this long-running operation protected and advanced its goals, and it is relevant to all charged coconspirators. Viewed through this lens, all of the evidence that might be entered against Mr. Gooch and other Group Three defendants would be admissible in a separate trial against Mr. S. Hinson, whether tried alone or with Mr. Odle. In fact, evidence of the violent acts allegedly perpetrated by those slated for trial in Group Three was introduced in the Group One trial, as it was relevant to establishing the existence, scope, and activities of the M Street Crew.

By clearly distinguishing among all defendants in its presentation of evidence, as the Government did in the Group One trial, by using cautionary instructions throughout the trial and in the final instructions, and by preparing a special verdict form that carefully delineates who is charged

with which counts, the Court can protect codefendants from charges that do not concern them, without unnecessarily forcing a third prolonged prosecution. Accordingly, after considerable thought on the matter, the Court concludes that Mr. S. Hinson is properly joined for trial with Group Three, and that severance under Rule 14 is not warranted.

### 2. Mr. Odle

Mr. Odle's arguments complement those of Mr. S. Hinson. Relying heavily on *United States v. Levine*, 546 F.2d 658, 661 (5th Cir. 1977), he argues that joinder is improper under Rule 8 because the indictment fails to allege joint action between him and any of his codefendants and, thus, inadequately alleges a common scheme or plan. Odle Opp'n at 3-4. Alternatively, Mr. Odle argues that severance under Rule 14 is appropriate because of the disparity in the nature of the substantive charges against him and his more violent codefendants, which he fears will result in prejudicial spillover. *Id.* at 9. Specifically, Mr. Odle notes that he has been incarcerated continuously since late 2002, during the latter two years of the alleged conspiracies, and suggests that, as he is charged with only two substantive drug charges and the two conspiracy counts, he runs a high risk of sitting for months at trial before his name is even mentioned. Mr. Odle likens his situation to that of April Dodd, whom the Court earlier severed from the Group Three trial. *Id.* at 10.

The indictment charges Mr. Odle in four counts: Count 1 (narcotics conspiracy), Count 2 (RICO conspiracy), Count 4 (PWID PCP 11/8/02), and Count 5 (PWID ecstasy 11/8/02). It also names Mr. Odle in one overt act that is not substantively charged: Overt Act 20 (firearm possession 12/16/02). The Government plans to link Mr. Odle to his alleged coconspirators through group photos in which the M Street sign is displayed, cooperator testimony that will identify him as

-18-

a member of the Crew, and evidence that Mr. Odle, as the only Crew member with valid Maryland identification, was the "principal supplier" of ammunition for the Crew.  Gov't Reply at 4.

Moreover, although the Government concedes that the substantive charges against Mr. Odle, as they are presented in the indictment, do not allege joint activity with other defendants, *id.* at 4, 5, it submits that trial testimony will demonstrate group involvement surrounding each offense.  With respect to the November 8, 2002, drug charges, the Government proffers that, to avoid arrest, Mr. Odle fled into the restroom at Eddie Leonard's Carry Out, where he was apprehended. In the meantime, Anthony Davis,[13] who managed to evade police, reported to other Crew members that the police were about to arrest "his man," which prompted Mr. Gooch to "walk[] over to the [Eddie Leonard's] parking lot and[,] armed with a Desert Eagle .44 caliber handgun[,] . . . open[] fire at Officer Hoffman and her squad car," nearly striking the officer in her head.  Gov't Reply at 4-5.  Mr. Gooch is charged with three offenses stemming from this incident: Count 122 (assault with intent to kill); Count 123 (assault of a police officer); and Count 124 (VICAR attempted murder). The Government suggests that Messrs. Davis's and Gooch's response to Mr. Odle's arrest was illustrative of the manner in which the Crew members acted in concert to avoid detection and resist apprehension by police.  Gov't Reply at 5.

The Government also submits that joint activity underlies the overt act charging Mr. Odle with gun possession on December 16, 2002.  On that date, Mr. Odle allegedly went to a Maryland nightclub with codefendants Joseph Blackson, Jamal Hinson, Kenneth Cole, Anthony Davis, and Kran Bell.  The group left the nightclub in two cars; in one car were Mr. Odle, Mr. Bell,

_____

[13] Mr. Davis is a Group Two defendant who accepted a plea offer and has now been sentenced.

-19-

a "crew photo" taken at the nightclub that night, and a loaded Intratec 9mm pistol belonging to a codefendant. Gov't Reply at 4. A traffic stop led to Mr. Odle's arrest and the seizure of the gun and photograph. The Government plans to use this episode to establish that Defendants routinely went to nightclubs where they held themselves out to be the M Street Crew and were recognized as such, and that the Crew commonly carried and shared weapons.

### a. Rule 8

As an initial matter, the Court concludes that the joinder of Mr. Odle to the Group Three defendants is proper under Rule 8(b). All Group Three defendants are charged with the narcotics and RICO conspiracies in Counts 1 and 2. *See Spriggs*, 102 F.3d at 1255 (noting that "Rule 8(b) can be satisfied . . . for instance when a conspiracy charge links all the offense and defendants . . . ."); *Gbemisola*, 225 F.3d at 760 (holding that joinder is proper, even without a conspiracy charge, when the offenses stem from participation in the same drug distribution scheme). Moreover, in light of the Government's earlier elaboration of the relationship between the crimes of violence and the narcotics and RICO conspiracies, Gov't Supp. Opp. at 6-8 & n.2 [Dkt. #396], and the trial record in the Group One trial at which some evidence of these alleged violent activities was presented, the Court is satisfied that the alleged violent acts could reasonably be viewed by a jury as having been committed in furtherance of the RICO conspiracy. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (holding that furtherance of the criminal enterprise need not be the sole or principal motive). The Government will either prove or not prove, at the Group Three trial, that the alleged murders and other violent acts were in furtherance of the enterprise alleged. The indictment charges that they are connected; this is a question of fact on which the Government is entitled to put on its evidence. In any event, all the charges, including the

crimes of violence, satisfy the "logical relationship" test, and thus are properly joined under Rule 8(b).  *See United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991); *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987).  Moreover, as to Mr. Odle's argument that the indictment fails to allege joint action between him and his codefendants, the Court notes that "Rule 8(b) can be satisfied either by the indictment alone, as for instance when a conspiracy charge links all the offenses and defendants, or by subsequent pre-trial representations."  *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (citations and internal quotation marks omitted).  Here, the overarching conspiracy charge is enough but, were it not, the Government's representations about the circumstances underlying the substantive charges and overt acts against Mr. Odle surely suffice.  Accordingly, Mr. Odle is properly joined under Rule 8(b).

### b. Rule 14

The balance of Mr. Odle arguments for severance rest on Rule 14, which permits severance upon a demonstration of prejudice — specifically, a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  As detailed above, Mr. Odle presents a variation on the argument that disparate levels of culpability and evidence between him and Messrs. Gooch, Dorsey, J. Robinson, and Dodd will result in a spillover effect, such that the jury will be unable to compartmentalize the evidence against each.

In this regard, Mr. Odle is less favorably situated than Mr. S. Hinson.  Although Mr. Odle faces fewer substantive charges (2) than does Mr. S. Hinson (5), the Government proffers evidence that he possessed a firearm on December 12, 2002, and that he was connected, through his actions and those of Messrs. Davis and Gooch, to the attempted murder of a police officer on

November 8, 2002. Thus, although there is clearly some disparity in the *number* of charges against Mr. Odle as compared to his proposed trial codefendants, given his more direct connection to acts of violence and gun possession, there is less concern about any disparity in the *nature* of those charges. Moreover, the Government further indicates that, for the drug offenses on November 8, 2002, there will be testimony that Mr. Odle was pursued into the restroom at Eddie Leonard's, where he was arrested and the drugs were recovered from a trash can. Thus, there is sufficient, particularized evidence of the substantive drug charges to minimize any risk of spillover. *See Sampol*, 636 F.2d at 646. For these reasons, in addition to those set forth in Part II.B.1 with regard to Mr. S. Hinson, the Court finds that severance of Mr. Odle is not warranted under Rule 14.

### C.  Mr. Odle's Motion to Dismiss Counts 1 and 2

Mr. Odle, joined by all codefendants, next moves to dismiss Counts 1 and 2. He first asserts that the indictment does not adequately allege that he was a member of either the narcotics conspiracy or the RICO conspiracy and thereby violates Federal Rule of Criminal Procedure 7(c) and the Fifth and Sixth Amendments to the U.S. Constitution. Regarding Count 1, he specifically argues that the indictment fails to allege specifically that Mr. Odle entered into an agreement to possess and distribute narcotics, and that no overt act ties him to any other defendant. Similarly, as to Count 2, he contends that the indictment fails to allege sufficiently that Mr. Odle knew of and agreed to any racketeering activity, and that no overt act connects him to any other defendant. In the alternative, Mr. Odle argues that Count 1 must be dismissed because it charges multiple offenses in a single count. He submits that the narcotics conspiracy count is flawed because it alleges not one overarching conspiracy, but three separate ones — a narcotics conspiracy, a conspiracy to commit robbery and murder, and another conspiracy to commit murder — in addition to separate substantive

offenses of murder and assault.  As he explains in detail:

> By its own terms, Count One of the Indictment clearly charges the defendants with a conspiracy related solely to the possession and distribution of narcotics: Martin supplied Franklin, who distributed to others; in turn, they acted as suppliers, shippers, and street sellers. And while the Indictment alleges that the defendants carried firearms to protect the narcotics operation, nowhere does the Indictment allege that violent acts such as murder and robbery were goals of the conspiracy, nor were such violent acts alleged to be ways, manners, or means to accomplish the conspiracy.  Yet, the Indictment describes 11 such acts of violence in Count One's Overt Acts.

> By the Indictment's own terms, these 11 alleged acts — committed by only six of the defendants — are not encompassed by the alleged narcotics conspiracy.  Instead, they constitute at least two additional conspiracies: one conspiracy between Messrs. Gooch, Dorsey, and Robinson to commit robbery and murder on August 1, 2000, and a separate conspiracy between Messrs. Franklin and Simmons to commit murder on March 28, 2003.  The 11 overt acts also encompass four separate substantive offenses of murder: one by Mr. Bell on August 24, 2002; one by Mr. Gooch on September 13, 2002; and two others by Mr. Gooch on February 21, 2003.  They also charge one substantive count of assault by Mr. Gooch on November 8, 2002; and one shooting by Messrs. Franklin and Simmons on March 28, 2003.  Because Count One actually charges multiple offenses in a single count, it must be dismissed.

Odle Mot. at 8-9 (citations to the indictment omitted).

The Government counters that an indictment simply need not contain the degree of detail that Mr. Odle would like.  It suggests that an indictment is generally sufficient if it states the elements of the offense charged and provides sufficient detail to protect against the risk of double jeopardy, and asserts that the indictment here goes further, listing specific conduct in the form of overt acts, even though overt acts are not elements of the offense of narcotics conspiracy.  Finally, the Government argues that it need not allege how Mr. Odle entered the conspiracy or how he agreed to obtain and distribute narcotics, for there is no requirement that an indictment specify the evidence

to be produced at trial for it to pass constitutional muster.

### 1. Adequacy of the indictment

The Fifth Amendment "guarantees that prosecutions for serious crime may be instituted only by indictment," *United States v. Haldeman*, 559 F.2d 31, 123 (D.C. Cir. 1976), while the Sixth Amendment requires that a criminal defendant be "informed of the nature and cause of the accusation" against him, U.S. Const. amend. VI. These constitutional guarantees are reflected in Federal Rule of Criminal Procedure 7(c), which provides that an indictment must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Accordingly, the Supreme Court has emphasized that "a valid indictment offers two fundamental protections to the accused: (1) it informs the accused of the charges against him so that he may adequately prepare his defense; and (2) it describes the crime with sufficient specificity to protect the accused against future prosecution for the same offense." *United States v. Cisneros*, 26 F. Supp. 2d 24, 45 (D.D.C. 1998) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)). To serve these goals, an indictment generally "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crimes." *United States v. Haldeman*, 559 F.2d 31, 124 n.262 (D.C. Cir. 1976) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

The indictment here goes well beyond these requirements. Tracking the language of 21 U.S.C. §§ 846 and 841, the indictment alleges in Count 1 that, from 1997 to 2004, the defendants, including Mr. Odle, conspired to possess with intent to distribute and to distribute PCP, ecstasy, and cocaine base. It states that goals of the narcotics conspiracy were, *inter alia*, to acquire and distribute these drugs in order to obtain as much money and other things of value as possible; to create and

-24-

control a marketplace for its distribution activities; and to protect its members from detection and apprehension.   In describing the "ways, manner, and means" of the alleged conspiracy, the indictment identifies the suppliers and leaders of the conspiracy; asserts that the members played specialized roles in the organization; explains that, in its early years, the conspiracy trafficked in crack cocaine, but later shifted into the PCP and ecstasy markets; explains that the members facilitated their activities by using cellular phones, nicknames, and coded language; and indicates that the members carried and used firearms to protect their operation from theft and competition from rivals, and to enforce discipline within its ranks.   It then lists some 142 overt acts allegedly committed in furtherance of the narcotics conspiracy.   Thus, contrary to Mr. Odle's protestations, Count 1 plainly *does* allege that Mr. Odle agreed with his codefendants — or, in the precise words of the indictment, "combine[d], conspire[d], confederate[d] and agree[d] together" — to commit the charged offenses.   There is no requirement that an overt act connect him to any other defendant; indeed, inasmuch as "[t]he drug conspiracy statute, 21 U.S.C. § 846, dispenses with the usual requirement of an overt act and requires only an agreement" to commit the charged offense, *United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006), the Government need not have listed those details at all.

Mr. Odle relies on *Russell*, 369 U.S. at 764, to argue that the indictment lacks a sufficiently specific statement of the "facts and circumstances as will inform [Mr. Odle] of the specific offense, coming under the general description, with which he is charged." Odle Mot. at 5. In *Russell*, the Supreme Court held that an indictment under 2 U.S.C. § 192 — which proscribes the refusal to answer questions pertinent to the "subject under inquiry" before a congressional committee — must identify with some precision the "subject under inquiry," because "[w]here guilt depends

so crucially upon such a specific identification of fact, . . . an indictment must do more than repeat the language of the criminal statute." *Russell*, 369 U.S. at 764. Connecting the dots, the Court interprets Mr. Odle's argument to be that, in a conspiracy charge, the "crucial . . . identification of fact" is the "agreement" to commit the underlying substantive offense.

While *Russell* is animated by a broad principle, its reach is limited to particular statutory schemes in which the "very core of criminality" proscribed cannot be ascertained without greater specificity. *See Haldeman*, 559 F.2d at 124-25; *Cisneros*, 26 F. Supp. 2d at 46. Here, by contrast, the indictment alleges the existence of an agreement, provides a relevant time period, describes the goals and means of the conspiracy, and identifies underlying behavior allegedly committed in furtherance of the conspiracy. Mr. Odle presumably seeks further details about the nature of the agreement itself — for example, the who, when, and where of his alleged decision to join the M Street Crew. But an indictment "is an instrument of accusation, not of proof," *Cisneros*, 26 F. Supp. 2d at 46, and "neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed," *Haldeman*, 559 F.2d at 124. In any event, a conspiratorial agreement need not be explicit; its existence can be inferred from other evidence. *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006). The level of detail sought by Mr. Odle is a matter for trial, not the indictment. The indictment adequately informs Mr. Odle of the charges against him, and is sufficiently specific to allow him to prepare a defense and protect himself against double jeopardy. *See Russell*, 369 U.S. at 763-64.

The same goes for Mr. Odle's complaints about Count 2. Tracking the language of 18 U.S.C. §§ 1962(d) and 1962(c), that count alleges — in greater detail than need be set forth here

-26-

— that from 1997 to 2004, Mr. Odle and his codefendants, as members of a RICO enterprise, conspired to "conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity."  It describes the alleged members of the enterprise, its principal locations, and its goals — which, as for the narcotics conspiracy, included trafficking in controlled substances to make money, and using guns and violence to protect the enterprise, control the marketplace, and enforce discipline.  It specifically incorporates the "means" of the conspiracy set forth in Count 1, and adds that the members used violence and threats of violence to protect and expand the enterprise's operations and promote a client of fear.  It also lists the offenses constituting the pattern of racketeering activity and incorporates by reference the overt acts detailed in Count 1.  Accordingly, the indictment is also adequate as to Count 2.

### 2. Multiple conspiracies

To the applause of his codefendants,[14] Mr. Odle contends that Count 1 charges multiple offenses in a single count and must therefore be dismissed.  Acknowledging that whether "the *evidence* establishes a single or multiple conspiracies is a question of fact for the jury to decide," Odle Mot. at 7 (quoting *United States v. Ellender*, 947 F.2d 748, 759 (5th Cir. 1991)), Mr. Odle asks the Court "to review the *indictment* to determine whether the allegations themselves, taken as a whole, fall within a legal theory that supports joinder."  *Id.* (citing, *inter alia*, *United States v. Nachamie*, 101 F. Supp. 2d 134, 153-54 (S.D.N.Y. 2000) (finding the court has the power to inquire into the Government's theory of joinder and can conclude, as a matter of law, that a conspiracy count purporting to allege a single conspiracy actually charges multiple conspiracies)).  He argues that

_____

[14] Mr. Odle's motion is joined by Messrs. Gooch [Dkt. #575], S. Hinson [Dkt. #572], Dodd [Dkt. # 567], J. Robinson [Dkt. # 560], and Ms. Dodd [Dkt. # 573].

Count 1 is focused "solely" on the possession and distribution of narcotics; that violent acts such as murder and robbery are nowhere alleged to be "goals" or "means" of the narcotics conspiracy; and, therefore, that the violent crimes listed as overt acts in Count 1 actually form two additional, separate conspiracies that are distinct from the narcotics conspiracy.  Mr. Odle also complains that the indictment fails to set forth facts connecting the violent crimes to the narcotics conspiracy.

In response, the Government posits that the indictment charges just one conspiracy in Count 1, and that it explains, in Paragraph 6 of the "ways, manner, and means" description, how non-drug trafficking crimes furthered the goals of the conspiracy.  That paragraph alleges:

> It was further part of the conspiracy that the defendants and co-conspirators possessed, carried and used firearms to protect their drug trafficking operation from theft, robbery, and competition from rival sellers.  These weapons were possessed, carried *and used* for various reasons, including but not limited to: to protect the organization's narcotics and the proceeds of drug distribution; to ensure that drug distribution activities were controlled by the defendants and co-conspirators; to enforce discipline within the organization; to intimidate others from distributing . . . PCP, cocaine base, . . . and ecstasy in the organization's area; and to ensure the personal safety of the members of the organization.

Indictment at Count 1, ¶ D(6) (emphasis added).

Moreover, in an earlier pleading submitted in response to the Court's request for supplemental briefing, the Government elaborated on the nexus between the charged acts of violence and the narcotics and RICO conspiracies.  In that brief, the Government argued specifically that: the murders of (and theft of money and drugs from) Messrs. Cunningham and Lane were committed for pecuniary gain and to enhance Defendants' reputations among their coconspirators; the shots fired at the police car by Mr. Gooch were intended to distract police from the arrest of Mr. Odle; the murder of Mr. Miles sought to quiet him and (unsuccessfully) avoid attracting the attention of the

police to the Crew's activities; and the murders of Mr. Cooper and Ms. Miller were motivated by a number of circumstances, one of which was related to Mr. Gooch's position as enforcer.

       The Court concludes that, based on the allegations in the indictment, Count 1 charges a single conspiracy with the goal of acquiring as much money as possible through a variety of means, including using guns and violence to protect the Crew's product and proceeds, maintain a monopoly on the real estate around 18th and M Streets NE, and ensure the Crew members' safety. Mr. Odle and his codefendants may, of course, argue to the jury that the facts adduced by the Government demonstrate that there was not one, but several conspiracies; that, however, is a matter for trial.

       Mr. Odle's motion to dismiss Counts 1 and 2 will be denied.

### D. Mr. Gooch's Motion to Dismiss Counts 1 and 2

       Larry Gooch also moves to dismiss Counts 1 and 2 [Dkt. # 576]. He argues that the indictment alleges multiple conspiracies — one before and one after Jonathan Franklin emerged as a leader in 2002 — and that the indictment impermissibly allows the Government to "prosecute a neighborhood." In essence, Mr. Gooch asserts that when Jonathan Franklin entered the conspiracy as a supplier of PCP, he created a different drug organization, which differed from the preexisting distribution conspiracy in terms of membership and preferred drug of sale.

       There are a number of flaws to this argument. As a matter of law, defendants may enter or join an ongoing conspiracy and need not be present at the conspiracy's inception in order to be a member. *United States v. Bridgeman*, 523 F.2d 1099, 1104-08 (D.C. Cir. 1975) ("A defendant can join a conspiracy at any time, and can properly be convicted though he was not in the conspiracy at its inception. . . . An individual who joins an already formed conspiracy knowing of its unlawful purpose may be held responsible for acts done in furtherance of the conspiracy both

prior to and subsequent to his joinder." (citations omitted)). Mr. Franklin himself sold cocaine base at 18th and M Streets in the late 1990s before he developed a supply for PCP and became a supplier himself to those selling "retail" quantities on the street. The addition of PCP and ecstasy to the menu did not end some Crew members' willingness to sell crack; it simply expanded the Crew's operations (in terms of products and quantities) to include those more profitable drugs. This evolution does not necessarily defeat the singularity of the conspiracy as it is fairly pled in the indictment.

Finally, the indictment does not charge a neighborhood. It charges a specific group of defendants with having created an open air drug market at 18th and M Streets, and of having taken over that property for their illicit purposes, marking their territory with graffiti, controlling who and what were sold on the streets, using local apartments as stash houses and hideaways, and generally turning the neighborhood into a haven for drug users. It is not the neighborhood that is being prosecuted; it is those who are alleged to have warped the neighborhood for their illegal purposes. Mr. Gooch's motion to dismiss Counts 1 and 2 will be denied.

### E. Mr. Gooch's Motion to Sever Counts and Strike Surplusage

Mr. Gooch next moves to sever Counts 110 through 119 and the accompanying overt acts, which cover the murders of William Cunningham and Christopher Lane on or about August 1, 2000. Mr. Gooch contends that another man charged in connection with the Cunningham/Lane murders, Herbert Jones, orchestrated a robbery of the two decedents and then, at the last minute, allegedly procured the help of the three defendants here (Messrs. Gooch, Dorsey, and J. Robinson). Mr. Gooch relates that Mr. Jones was tried in Superior Court but pleaded guilty part way through the trial and agreed to cooperate with the Government. Emphasizing that the robbery and shootings happened in another part of the city, miles away from 18th and M Streets NE, that Mr. Jones is not

alleged to have been a member of the M Street Crew, and that the decedents were neither members

nor competitors of the M Street Crew, Mr. Gooch argues that the Cunningham/Lane shootings have

"no apparent connection" to the charged conspiracy, other than the fact that alleged members of the

conspiracy are said to have committed them.

The Government disagrees. First, it notes that the argument made by Mr. Gooch was

considered and denied by the Court in its earlier severance order. Order of Dec. 16, 2005, at 22.

Second, it proffers, albeit vaguely, that trial testimony will demonstrate that Messrs. Gooch, Dorsey,

and J. Robinson "banded together as early as 1997 to commit crimes to further the goals of the drug

trafficking enterprise," suggesting that the Cunningham/Lane home invasion and murders are

illustrative of that joint activity.

The indictment charges that Defendants initiated their narcotics conspiracy as early

as 1997 and continued it until November 2004. Months ago, the Government offered its theory that

the murders of (and theft of money and drugs from) Messrs. Cunningham and Lane were committed

for pecuniary gain and to enhance Defendants' reputations among their coconspirators. *See* Order

of Dec. 16, 2005, at 20 & n.13; *see also* Part II.C.2 *supra*. As the Court has already concluded, "all

the charges, including the crimes of violence, certainly satisfy the 'logical relationship' test, and thus

are properly joined under Rule 8(b)." Order of Dec. 16, 2005, at 22. Whether the Government's

evidence will persuade the jury that the murders were, in fact, part of the larger alleged conspiracies

remains to be seen, but the Government, having articulated a logical relationship among the crimes,

is entitled to put forward its proof. That the Cunningham/Lane murders occurred in another part of

the city, and that Defendants face potentially damaging testimony from Mr. Jones, a cooperating

witness,[15] are insufficient reasons to sever these counts, and, in view of the Government's proffers, the Court finds no reason to suggest that Mr. Gooch will suffer prejudice by joinder of the Cunningham/Lane murder charges with the conspiracy charges. *See* Fed. R. Crim. P. 14(a); *Halliman*, 923 F.2d at 884*; Zafiro*, 506 U.S. at 539.

### F.  Mr. Gooch's Motion to Sever Counts 25, 26 and 29 and to Strike Surplusage

Finally, Mr. Gooch moves to sever three substantive drug distribution counts — Counts 25 (distribution cocaine base 3/20/03), 26 (distribution ecstasy 3/20/03), and 29 (distribution cocaine base 3/26/03) — and the corresponding overt acts and to strike all language from the indictment referring to them [Dkt # 579].[16]  As the Government explains, Count 25 stems from an incident in which Mr. Gooch allegedly sold about $1000 of crack cocaine to a special MPD employee, who had been introduced to Mr. Gooch by a third person (who may or may not have been a member of the M Street Crew).[17]  The sale took place on the 800 block of 21st Street NE, about

---

[15]  The Court notes that Jonathan Franklin and William "Mike" Simmons were charged with the murder of Kevin Lurk and the shooting of Shelby Anderson in the Group One trial on the basis of the evidence of a testifying cooperator.  The jury acquitted both men.  Mr. Gooch, joined by Messrs. Odle [Dkt. #571], S. Hinson [Dkt. #572], Dodd [Dkt. #567], J. Robinson [Dkt. #560], and Ms. Dodd [Dkt. #573], moves to strike evidence of this murder and shooting and, in response, the Government advises that it does not intend to offer evidence in its case in chief regarding Counts 129-133 against Group Three.  Gov't Opp'n to Defendant Gooch's Various Mots. to Sever, Dismiss, or Strike Counts [Dkt. #591] at 5.  Whether this information should be stricken from the indictment sent to the jury room will depend on whether such evidence appropriately comes in during the Government's rebuttal.  Accordingly, Mr. Gooch's Motion to Strike "Lurk" Murder Evidence [Dkt. #577] will be denied without prejudice.

[16]  This motion is joined by Messrs. Odle [Dkt. #571], S. Hinson [Dkt. #572], Dodd [Dkt. #567], J. Robinson [Dkt. #560], and Ms. Dodd [Dkt. #573].

[17]  Mr. Gooch identifies this third person as Andre Hinson, who he asserts was not a member of the M Street Crew.  Gooch Mot. at 1.  The Government does not identify the third person, but states that he or she *has* been identified as a Crew member.  Gov't Opp'n at 6 n.1.

-32-

five blocks from the intersection of 18th and M Streets. Count 26 alleges that, during this first sale, the special employee inquired about ecstasy, which prompted Mr. Gooch to phone Kenneth Dodd to arrange for Mr. Dodd to make a sale of 50 ecstasy pills. Count 29 alleges that, a few days later, the same special employee contacted Mr. Gooch directly and arranged to buy $1500 of crack cocaine, a sale that occurred at the Checkers on Maryland Avenue, about eight blocks away. Gov't Opp'n at 6 n.1. Mr. Gooch argues that these alleged sales are unrelated to the charged narcotics and RICO conspiracies because they occurred outside the confines of the 18th and M Street area, were facilitated by one (perhaps two) persons not part of the M Street Crew, and were uncharacteristic of the other charged drug offenses in that the crack sales were not of street level quantities, but of "wholesale" amounts.

These arguments are without merit. Illicit activity need not be strictly confined to a particular geographic area to be deemed in furtherance of a criminal conspiracy. As is clear from the indictment, the Government's evidentiary proffers, and the record of the Group One trial, the activities of the M Street Crew were not always limited to their home territory at 18th and M Streets. If the evidence demonstrates that a member of the M Street Crew actually introduced the special employee to Mr. Gooch to facilitate a drug sale, the fact that the sale was consummated away from 18th and M Streets does not transform it into an unrelated event. That point is for a jury to decide, not the Court to determine in the absence of hard evidence.

### III. CONCLUSION

For the foregoing reasons, the motions for joinder will be granted and the motions to sever defendants denied, the motions to dismiss and/or sever counts will be denied, and Messrs. Odle and S. Hinson will join Messrs. Dodd, J. Robinson, Dorsey, and Gooch in the Group Three trial

set to begin in January 2007, on each of the charges set forth in the indictment.  Accordingly, it is hereby

ORDERED that the motions for severance from Mr. Gooch based on the death penalty filed by Mr. Dodd [Dkt. #367], Mr. J. Robinson [Dkt. ##361, 388], and Mr. Dorsey [Dkt. #358] are DENIED; and it is

FURTHER ORDERED that the Government's oral motion for joinder of Messrs. S. Hinson and Odle to Group Three is GRANTED; and it is

FURTHER ORDERED that the motions for severance filed by Mr. S. Hinson [Dkt. #584][18] and Mr. Odle [Dkt. #569] are DENIED; and it is

FURTHER ORDERED that Mr. Odle's motion to dismiss Counts 1 and 2 [Dkt. #570] is DENIED; and it is

FURTHER ORDERED that Mr. Gooch's motion to dismiss Counts 1 and 2 [Dkt. #576] is DENIED; and it is

FURTHER ORDERED that Mr. Gooch's motion to sever Counts 110-119 and strike surplusage [Dkt. #565] is DENIED; and it is

FURTHER ORDERED that Mr. Gooch's motion to sever Counts 25, 26, and 29 and strike surplusage [Dkt. #579] is DENIED; and it is

---

[18] Mr. Odle's motion for leave to late-file [Dkt. #585] is granted.

**FURTHER ORDERED** that Mr. Gooch's motion to exclude evidence of the Lurk/Anderson shootings [Dkt. #577] is **DENIED** without prejudice.

**SO ORDERED**.

Signed: November 7, 2006

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge